UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Brian Oneal Tribble, | ) | C/A No. 5:13-cv-3015-KDW |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | ORDER |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security, | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

Complaint for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to

obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"),

denying his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act

("the Act"). Having carefully considered the parties' submissions and the applicable law, the court

*affirms* the Commissioner's decision, as discussed herein.

I.    Relevant Background

      A.    Procedural History

Plaintiff applied for DIB on March 15, 2010, pursuant to Title II of the Act, 42 U.S.C. §§

401-34, alleging he became disabled on June 15, 2008. Tr. 153.[1] In his form disability report,

Plaintiff indicated that he became unable to work because of his medical conditions, which

included right shoulder status post-labrum repair, anxiety, and depression. Tr. 99, 184. His

applications were denied initially and upon reconsideration. Tr. 99-103, 108-09. Plaintiff

---

[1] "Tr." is an abbreviation for Transcript of the Record that was before the Commissioner. It
is found on the docket of this case at ECF No. 13-1 through 13-13.

requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 111-13, which was held in Augusta, Georgia on February 8, 2012. Tr. 38-92. Plaintiff and Vocational Expert ("VE") Roger Decker testified at the hearing. Tr. 40-90. In a decision dated May 25, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Tr. 17-32. After considering some additional evidence submitted by Plaintiff after the ALJ hearing,[2] the Appeals Council denied Plaintiff's request for review on September 12, 2013, making the ALJ's decision the final decision for purposes of judicial review. Tr. 1-6. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on November 5, 2013. ECF No. 1.

B.    Plaintiff's Background

Plaintiff was born on July 9, 1972. Tr. 153. At the time of the hearing he was thirty-nine years old. Tr. 40. Plaintiff completed the ninth grade in high school, Tr. 62, and has past relevant work ("PRW") history as a bakery worker, a printer, and an order filler. Tr. 211-15.

C.    The Administrative Proceedings

1.    Plaintiff's Testimony

---

[2] Plaintiff submitted additional records from Lakeland Family Practice dated October 17, 2012, Tr. 8-9, and from The Beckman Center for Mental Health Services ("Beckman Center") dated June 7, 2012. Tr. 549-55. The Appeals Council "looked at" the Lakeland records, but returned them to Plaintiff without making them part of the official record based on its conclusion that the information in them "does not affect the [ALJ's] decision . . ." because the records covered a period of treatment after May 25, 2012, the last date of potential disability considered by the ALJ. Tr. 2. The Appeals Council noted that it "considered" the records from the Beckman Center and made them part of the official record, but found nothing therein that would require the ALJ's decision to be changed. Tr. 2, 6. Because the Appeals Council considered the Beckman Center records and incorporated this evidence into the record in reaching its decision, this court must also consider the contents of those records when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of HHS*, 953 F.2d 93, 96 (4th Cir. 1991).

In response to questioning by the ALJ, Plaintiff testified that he stopped working at his most recent order-filler job at a Wal-Mart Distribution Center because he sustained an injury to his shoulder and could no longer perform the work. Tr. 50. He stated that the primary reason he cannot work is panic attacks and anxiety, and that he cannot lift overhead because of the injury to his shoulder. Tr. 50-51. Plaintiff testified that his shoulder burns, stings, hurts, and that the pain radiates into his neck. He also said that he has numbness that radiates from his shoulder down to his right hand. Tr. 51. Plaintiff also testified that he has pain, aching, popping, and sore muscles in his right leg. Tr. 51-52. He testified that his overall pain on an average day is moderately severe, and he rated that pain as seven on a ten-point scale. He rated the pain in his legs and lower back as severe (eight on a ten-point pain scale) and testified that his back swells and stings and has a sensation of pulling and tearing. Tr. 52.

Insofar as his asserted mental impairments are concerned, Plaintiff testified that he is treated at the Beckman Center monthly. Tr. 53. He stated that he was hospitalized at Self Regional Healthcare Hospital in 2008 for depression and anxiety with suicidal thoughts. Tr. 57. He testified that he previously cut his arm and took an overdose of prescription drugs in a suicide attempt which resulted in his 2008 hospitalization. He also testified that he was hospitalized again in 2010 because of his mental disorders. Tr. 76. Plaintiff testified that he takes the medication Risperdal, which makes it difficult to concentrate and which causes him to have hallucinations and delusions and to be awake but unable to comprehend things. Tr. 59-60, 78. He stated that he has visual hallucinations which cause him to see people that are not there, and that he has had a problem with hearing voices throughout his life. Tr. 60. He stated that he suffers panic attacks two or three times a week, especially when he is around a lot of people or when traveling somewhere, which causes

3

him to feel nervous, panicky, and upset. He also said that when he is around crowds, he is afraid someone is going to do something to him. Tr. 55. Plaintiff further testified that his mental condition was affected by the murder of a member of his family, which he said caused him to start seeing things and hearing things and having panic attacks. Tr. 56. He stated the depression causes him to feel lonely and suicidal, and that when he has a panic attack he cannot breathe, he shakes and cries, and feels afraid and like he is going to die. He said that he sees people around him calling his name and reaching out for him, but they are not really there and he does not know them. Tr. 75. Plaintiff testified that the voices he hears tell him to harm himself, but he knows that they are not real and they are not voices he recognizes. Tr. 76-77. He said that after he has an episode of hearing voices, he usually has a panic attack. Tr. 77.

According to Plaintiff's hearing testimony, he is depressed and withdrawn, he stays by himself and avoids others, and he never goes out anywhere. Tr. 56. He stated that he spends most of the day in the garage at his house, where he talks to himself or watches CNN on television. Tr. 63-64. Plaintiff also testified that he has trouble dressing himself at times. Tr. 67. He said that he does almost no housework or yard work. Tr. 67-68. He said that he goes out of his home about once per week, usually to visit his parents, and that he does no type of physical activity and has no hobbies. Tr. 72-73. He said that he used to enjoy fishing and playing basketball, but that he does not do those things anymore because of his shoulder pain and physical limitations. Tr. 73. He stated that his mental condition has affected his marriage and he does not attend church. Tr. 74-75.

Plaintiff stated that he can lift approximately ten pounds and that he constantly gets up and down and changes from sitting to standing very often during the day. Tr. 69-70. Plaintiff said that he can stand approximately fifteen minutes at a time and sit down for approximately ten minutes at

4

a time and that he is limited in walking because of his back condition. Tr. 70-71. According to Plaintiff, the injury to his right shoulder and his subsequent shoulder surgery have limited his ability to grip things, causing him to be unable to lift things and to drop things that he does lift. Tr. 77. He testified that he cannot reach out at arm's length to lift a gallon of milk out of the refrigerator and that he cannot push and pull objects. Tr. 78.

2.     VE Testimony

The ALJ asked the VE to assume a hypothetical individual with the same education and PRW as Plaintiff who could perform light work with the following restrictions: (1) limited use of the upper right extremity and right hand to occasional pushing and pulling; (2) frequent balancing, and occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling; (3) never climb ladders, ropes, or scaffolds; (4) no overhead work with the right arm and occasional reaching at shoulder level with the right arm and occasional handling with the right arm; (5) avoid concentrated exposure to extreme cold and vibration, as well as exposure to hazardous machinery and heights. Tr. 82. The VE responded that such an individual could not perform Plaintiff's PRW with those restrictions, but could perform work available in significant numbers in the national or regional economy as a laminating-machine offbearer, an ironer, or a thermal surfacing machine operator. Tr. 82-83. The ALJ then asked the VE to assume that the same hypothetical individual could perform sedentary work with the option to sit or stand as needed without being off task and with the following additional limitations: (1) perform simple, routine tasks with no mandated, fast-paced production quotas in load-stress jobs with only occasional or superficial interaction with the public. Tr. 84. The VE testified that with these additional limitations, the hypothetical claimant could perform the following jobs: bench hand and table worker. Tr. 84. The ALJ then

5

asked the VE to assume that the same hypothetical individual would be off-task for ten to fifteen minutes per hour four or five times a day or as much as 25% of the work day. The VE responded that there was no work that the individual with that additional limitation could perform. Tr. 85. In response to Plaintiff's attorney's questions about descriptions of the jobs he mentioned in the response to the ALJ's hypothetical questions, the VE indicated that the jobs required the individual to inspect products to make certain they met quality standards. He stated that while these jobs were not production jobs in which the worker was on a production line, they did require the employee to meet production standards. Tr. 86-90. When Plaintiff's counsel asked him to assume that the hypothetical individual could not sustain attention and concentration during work for one hour out of a typical eight-hour work day on average, the VE testified there was no work which such an individual could perform. Tr. 90.

### 3.    The ALJ's Findings

In his May 25, 2012 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.    The claimant has not engaged in substantial gainful activity since June 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: Right Shoulder Status Post Labrum Repair; Anxiety; and Depression (20 CFR 404.1520(c)).

4.    The claimant has the following non-severe impairments: Spine Disorder and Substance Abuse.

5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). The claimant can lift up to 10 pounds occasionally, stand or walk for approximately 2 hours of an 8 hour workday, sit for approximately 6 hours of an 8 hour workday with normal breaks and with the ability to optionally alternate between sitting and standing as needed without being off task. The claimant is able to balance frequently, occasionally stoop, kneel, crouch and crawl and is never to climb ladders, ropes and scaffolds. The claimant cannot do any direct overhead work, occasional reaching at the shoulder level and/or occasional handling with the right arm. There are no limitations for the claimant's left arm. The claimant is able to perform simple, routine tasks with no mandated fast-paced production quotas as well as low stress work with occasional decision-making or changes in work setting. The claimant must avoid concentrated exposure to extreme cold and vibration and is to avoid all exposure to hazardous machinery and heights. The claimant is able to perform work in a non-public setting that requires only occasional or superficial interactions with the public.

7.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8.      The claimant was born on July 9, 1972 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

9.      The claimant has limited education and is able to communicate in English (20 CFR 404.1564).

10.     Transferability of job skills is not an issue in this case because the claimant's past work is unskilled (20 CFR 404.1568).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

7

12.     The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2008, through the date of this decision (20 CFR 404.1520(g)).

Tr. 19-32.

II.    Discussion

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . ." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Id.*; *see also Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*,

10

438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

> B.    Analysis

Plaintiff asserts that the Commissioner's decision should be reversed because the ALJ's RFC determination is not supported by substantial evidence due to his failure to consider significant evidence from examining and treating providers, his assignment of excessive weight to the opinions of non-examining state agency consultants, his improper discrediting of Plaintiff's statements regarding the nature and extent of his impairments, and his misconstruction of a portion of the opinion of an examining provider. Pl. Br. 13-18, 27, ECF No. 15; Pl. Resp. Br. 2-6, ECF No. 20. Plaintiff also asserts that reversal is required because the Appeals Council failed to adequately analyze the additional evidence that he submitted. ECF No. 15 at 18-21; ECF No. 20 at 6-7.The Commissioner responds that the RFC determination is supported by substantial evidence because the ALJ properly considered the record as a whole, adequately analyzed and reasonably weighed and interpreted the relevant professional opinion evidence and properly assessed Plaintiff's credibility. Def's Br. 10-26, 28-29, ECF No. 16. The Commissioner asserts that the Appeals Council was not required to explicitly discuss Plaintiff's additional evidence because it denied review and the evidence was either irrelevant in time or did not eliminate the substantial evidence that supports the ALJ's decision. *Id*. at 26-27.

1.     The RFC Determination

In making his determination that Plaintiff retained the capacity to perform sedentary work with some postural and environmental limitations, Tr. 21, the ALJ provided an extensive summary of the medical evidence contained in the record before him, Tr. 22-26, and then assigned "great weight" to opinions of several non-examining state-agency consultants (Drs. Kesser, Vogelsang, Durham), but "only moderate weight" to the opinion of an examining state-agency-retained consultant (Dr. Thompson), "partial weight" to the opinion of another reviewing state-agency consultant (Dr. Hopkins), and "no weight" to the report from another examining state-agency-retained examining consultant (Dr. Richardson). Tr. 28-30. The ALJ also partially discredited Plaintiff's hearing testimony and statements to medical providers about the nature and extent of his impairments and functional limitations. Tr. 26-27. The ALJ did not explicitly mention the name or analyze the report of Dr. Cleply, a psychologist who examined and tested Plaintiff during a period of hospitalization at Self Memorial Health Care, or the records from Laurens Mental Health Clinic ("Laurens MHC records") and Dr. Ebert, a psychiatrist who evaluated and provided medical management to Plaintiff at Laurens MHC,[4] in the portion of his decision wherein he assigned weight to the various expert opinions.

Plaintiff contends that the ALJ's failure to explicitly refer to Dr. Cleply, Laurens MHC, or Dr. Ebert or to specifically analyze or assign weight to their reports or records presents reversible

---

[4] Laurens Mental Health Clinic is a "satellite clinic" of The Beckman Center of Mental Health Services, both of which are operated by the South Carolina Department of Mental Health ("SCDMH"). *See* SCDMH, http://www.beckmancenter.com/about-us.html (last consulted 3/2/2015). The additional evidence submitted to the Appeals Council also shows Dr. Ebert as Plaintiff's treating psychiatrist at The Beckman Center.

error because of those doctors' and their reports' significance to the RFC determination insofar as Plaintiff's mental impairments are concerned. Plaintiff also asserts that the ALJ did not give sufficient consideration to the physical functional limitations described in the reports from Dr. Brown, the surgeon who performed his shoulder surgery, and assigned excessive weight to opinions rendered by reviewing consultants who never examined or treated him and not enough weight to those rendered by psychologist Dr. Thompson and Dr. Richardson, a doctor who specializes in physical medicine and rehabilitation, who both examined Plaintiff at the request of the state agency. Plaintiff also contends that the RFC determination should be reversed because the ALJ misinterpreted a portion of Dr. Thompson's report and penalized Plaintiff for his financial inability to afford long-term, consistent mental-health treatment.

a.     Dr. Cleply's Report and Laurens MHC Records

Plaintiff first asserts that the ALJ's decision should be reversed because he did not specifically discuss or analyze the report of Dr. Kyle Cleply, who met Plaintiff and conducted neuropsychological testing on October 8, 2010 upon referral from Plaintiff's attending physician at Self Regional Healthcare during a four-day inpatient admission for psychiatric care. In his report, Dr. Cleply opined that Plaintiff "tends to have difficulty mustering adequate psychological resources to cope [with complexities in his life] and can result in affective problems and impaired thinking . . . [and that] he is susceptible to some type of affective disorder with psychotic features." Tr. 473. Dr. Cleply also noted that some of the test results were indicative of "poor effort" on Plaintiff's part as well as some "residual psychosis," and recommended that Plaintiff follow up with a psychiatrist to obtain "psychotropic medication" and that he participate in "psychosocial

13

counseling." *Id*. He specifically stated that "[f]ollowup care will likely help [Plaintiff] considerably . . . ," but he did not provide any opinion on Plaintiff's ability to perform work. *Id*. Plaintiff also contends that the ALJ erred by failing to explicitly mention or analyze records from the Laurens MHC showing consistently low GAF scores.[5] Tr. 504-05 (medical monitoring note dated October 29, 2010), 532-46 (treatment notes for Plaintiff's appointments there from October 2010 through January 2012) ("Dr. Ebert's records"). Those records show that Plaintiff was mainly seen by Dr. Ebert periodically for evaluation of continuing symptoms of depression and anxiety and medication monitoring.

The ALJ did refer to and summarize the "[r]ecords from Self Regional Healthcare," which include Dr. Cleply's report, in his general exposition of the available medical records that were considered in making the RFC determination. Tr. 26. Specifically, the ALJ referenced the findings from "[n]europsychiatric testing" included in those records such as "poor effort" and "attention deficit concentration likely due to residual psychosis." Tr. 26. Review of the subject records discloses that those findings came directly from Dr. Cleply's report. Insofar as Dr. Ebert's treatment notes are concerned, the ALJ also summarized the records from "Laurens County Mental Health Center" in his exposition of available medical evidence. Tr. 26.

---

[5] "GAF" is an abbreviation for Global Assessment of Functioning. A GAF score is used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults. GAF scores range from 0-100. The higher a score, the greater an individual's ability to function and carry out activities of daily living. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 549, nn.2-3 (D.S.C. 2009) (referencing Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000)).

14

It is widely held that ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision. *See, e.g.*, *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole). Moreover, an ALJ's findings, including those involving interpretation of medical evidence, will be upheld by this court provided they are rational and have sound support by the record. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d at 543.

Initially, Plaintiff's contention that the ALJ had "an affirmative duty" to explicitly discuss Dr. Cleply's report and Dr. Ebert's records because those doctors personally interviewed and evaluated Plaintiff and their findings were significant, ECF No. 20 at 5, is legally incorrect. *See Johnson v. Barnhart*, 434 F.3d at 654 n.5 (citing *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)) (an ALJ is not required to give greater weight to examining or treating physician opinions "'in the face of persuasive contrary evidence'"). Moreover, the ALJ was justified in omitting explicit analysis of Dr. Cleply's report or Laurens MHC or Dr. Ebert's records from his RFC

15

analysis because they do not contain a professional opinion directly addressing Plaintiff's ability to do work. While some of these reports and records contain background narrative clearly based on Plaintiff's self-reporting of his impressions of the extent to which his symptoms affect his ability to do work and show findings that support the ALJ's step-two finding that Plaintiff's anxiety and depression are severe impairments, neither Dr. Cleply nor Dr. Ebert provided a professional "opinion" on Plaintiff's ability to do work in light of his demonstrable functional limitations. The Laurens MHC records contain Dr. Ebert's treatment notes, which are limited to his impressions of the status of Plaintiff's mental health at the time of his examination and his recommendations for continuing care. Tr. 532-55. The ALJ's failure to explicitly mention either Dr. Cleply or Dr. Ebert in his discussion of the weight accorded expert opinions does not indicate a "broad rejection" without appropriate consideration of the information about Plaintiff's condition contained in those reports and does not indicate a failure to consider the record as whole. As previously shown, applicable law does not require an ALJ to specifically address and analyze every medical report submitted by a claimant, and this is particularly true where, as here, neither Dr. Cleply's report nor Dr. Ebert's records contain any professional opinion regarding the extent to which the claimant's impairments and functional limitations affect his ability to perform work.[6] Also, even though Plaintiff argues that the ALJ's failure to explicitly mention the consistently low GAF scores noted

_____

[6] As the Commissioner notes, the ALJ did extensively discuss, analyze, and assign "moderate" weight to the opinion of Dr. Thompson, a psychologist who performed an evaluation of Plaintiff on request of the state agency. Tr. 28-29. Dr. Thompson's report was issued only a few months before (June 10, 2010) and contained similar findings and diagnoses of Plaintiff's mental health to those contained in Dr. Cleply's report dated October 8, 2010.Unlike Dr. Thompson's report, neither Dr. Cleply's report nor Dr. Ebert's records contain an opinion on whether or not Plaintiff's mental health precluded employment.

on the Laurens MHC/Dr. Ebert's records in his RFC analysis indicates a failure to consider that aspect of the records, the ALJ was not required to explicitly discuss medical records simply because they contained notations of consistently low GAF scores. *See Mitchell v. Astrue*, No. 2:11-cv56-MR, 2013 WL 678068, at *8 (W.D.N.C. Feb. 25, 2013) (citing *Howard v. Comm'r of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002)) ("The failure to reference a GAF score is not, standing alone, however, a sufficient ground to reverse a disability determination.").

Having reviewing the record, the undersigned finds the ALJ did not commit reversible error by failing to explicitly analyze or assign specific weight to Dr. Cleply's report or the Laurens MHC/Dr. Ebert records in his discussion of the rationale for his RFC determination. As long as an ALJ's discussion is sufficiently detailed to permit a reviewing court to determine the ALJ's rationale and the record evidence leading to the ALJ's conclusion, failure to explicitly mention each piece of evidence before the ALJ is not reversible error. *See Dyer v. Barnhart*, 395 F.3d at 1211; *Kelly v. Astrue*, No. 5:08-CV-289-FL, 2009 WL 1346241, at *11 n. 3 (E.D.N.C. May 12, 2009).

b.    Weight Assigned to the Expert Opinions

Plaintiff contends that the ALJ assigned excessive weight to the RFC opinions provided by several state-agency medical consultants who did not personally examine or treat Plaintiff. He also asserts that the ALJ gave insufficient weight to the reports of medical providers who did personally examine Plaintiff. In particular, Plaintiff objects to the ALJ's assignment of "great weight" to the RFC opinions provided by state-agency consultants Drs. Kesser; Vogelsang, and Dr. Durham, while assigning only "moderate weight" to Dr. Thompson's opinion and failing to explicitly

17

analyze or assign weight to the reports from Dr. Cleply or Dr. Richardson or the records from Dr. Ebert and Laurens MHC. Plaintiff asserts that because Drs. Cleply, Thompson, Richardson,[7] and Ebert each personally examined and interviewed Plaintiff, their reports and records showing persistent and serious symptoms from Plaintiff's mental and physical impairments and consistently low GAF scores should have been assigned greater weight than the opinions of the state-agency consultants who only reviewed the medical reports then available.

The ALJ assigned "great weight" to Dr. Kesser's opinion that Plaintiff had only "mild limitations" in functioning caused by his "severe mental impairments." She also opined that her review of the available medical evidence indicated that Plaintiff's symptoms would likely resolve and be "non severe by June 2011" with appropriate treatment. Tr. 451. The ALJ stated that he assigned Dr. Kesser's opinion great weight because it was "well supported by the medical evidence" and showed consideration of "the objective findings against the claimant's statements and used specific reasoning as to why the claimant's [RFC] was grounded in the evidence." Tr. 29. The ALJ also noted that the opinion was supported by other record evidence showing that Plaintiff had undergone "minimal" and "conservative" mental-health treatment and had shown improvement with counseling and medication. *Id*. The ALJ also assigned great weight to the opinion of Dr. Vogelsang, an osteopath, who opined that her review of the available medical records indicated that, even with credible functional limitations arising from Plaintiff's physical

---

[7] The ALJ specifically stated that he assigned "no weight" to Dr. Richardson's report because it did not contain a "functional capability opinion." Tr. 29. Plaintiff does not appear to challenge this particular conclusion, and, as discussed previously, the same inadequacy is apparent from both Dr. Cleply's report and Dr. Ebert's records.

and mental impairments described in the records, Plaintiff can perform light work limited by certain postural and environmental restrictions. Tr. 452-59. Regarding this opinion, the ALJ indicated that he assigned it great weight because it was based on a detailed review and discussion of the contents of Plaintiff's medical records and his statements about his activities of daily living. Tr. 29-30. Insofar as Dr. Durham's opinion that Plaintiff had a "moderate" degree of functional limitation, but that he could still perform some simple and repetitive work tasks in a setting that does not often require him to interact with the public is concerned, the ALJ indicated that he assigned it great weight in his RFC determination because it was consistent with Dr. Kesser's opinion and, like hers, was supported by the record as a whole. Tr. 30. The ALJ gave "no weight" to state-agency examining consultant Dr. Richardson's report because it did not contain a functional capability opinion. *See supra* note 6. However, the ALJ did say that he considered Dr. Richardson's test results in his RFC determination. Tr. 29. The ALJ assigned "only moderate" weight to Dr. Thompson's opinion that Plaintiff's functional limitations arising from his mental illness would prevent him from "working around people or in a typical work environment without an expectation that his psychological symptoms would intensify and job would be interrupted and possibly he may require hospitalization under any intensified stress," Tr. 429, because he found that it was "not fully supported by the medical evidences [sic] of record as a whole" and because "the opined limits are not restrictive." Tr. 28. As previously noted, although the ALJ included a general exposition of the contents of their records in his decision, he did not explicitly analyze or assign a weight to Drs. Cleply or Ebert's records.

19

The applicable law in this Circuit holds that "[t]he ALJ is not required in all cases to give a treating physician's opinion greater weight than other evidence. If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). "Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; *see* 20 C.F.R. § 404.1527(c). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d at 178). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. Further, in undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence.

20

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). However, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

Initially, it is noted that neither Dr. Thompson nor Dr. Cleply actually treated Plaintiff for his mental-health impairments. Both doctors are psychologists who evaluated Plaintiff one time at the request of the state agency and another physician respectively. Arguably, Dr. Ebert qualifies as a treating physician even though the available records only disclose an approximately one-year treatment relationship with Plaintiff as of the time of the ALJ hearing. Also, Dr. Richardson did not treat Plaintiff. She conducted a one-time examination and evaluation of Plaintiff's physical complaints at the request of the state agency. Tr. 432-34. Nevertheless, giving Plaintiff's argument the greatest benefit of doubt, for purposes of this Order, they are considered "treating sources" because they personally examined and evaluated Plaintiff at least once.

Insofar as Dr. Thompson's opinion is concerned, the ALJ assigned "only moderate" weight to his opinion, issued following a one-time evaluation of Plaintiff, that Plaintiff's mental condition

would worsen "and his job would be interrupted . . . ," Tr. 429, if he were required to perform work. In doing so, the ALJ provided relatively extensive analysis of the conclusions reached by Dr. Thompson and specifically noted the arguably open-ended nature of his opinion in light of a recommendation that it be "revisited" after Plaintiff undertook a consistent course of mental-health treatment. Tr. 28. The ALJ also noted other record evidence that was inconsistent with Dr. Thompson's opinion such as the limited and conservative mental-health treatment that Plaintiff had pursued up to the time of his evaluation, reports from his treating physicians at Laurens MHC showing that Plaintiff's symptoms improved with appropriate medication and counseling, and opinions from other medical experts indicating that Plaintiff retained sufficient RFC to perform some work. Tr. 28-29. Additionally, the ALJ likewise provided detailed and specific analysis of his rationales for assigning greater weight ("great weight") to the opinions rendered by Drs. Kesser, Vogelsang, and Durham. Tr. 29-30. He also discussed and gave "partial weight" to the opinion of another state-agency consultant, Dr. Hopkins, who limited his opinion to Plaintiff's physical impairments and opined that Plaintiff could perform medium work even with the functional limitations arising from his shoulder and other musculoskeletal impairments. Tr. 30. Although it does not appear that Plaintiff specifically objects to the ALJ's treatment of Dr. Hopkins' opinion, the undersigned has also reviewed it in connection with consideration of the ALJ's determination of the weight to assign to all opinions. Although Plaintiff asserts that the opinions from the non-examining state-agency consultants were not entitled to the great weight accorded them because they "contain no reasoning, no specific findings, no indication of the records considered and the weight given to the various medical records in the file," ECF No. 20 at

2, review of the subject records in conjunction with applicable Social Security Regulations indicates that the reports are sufficiency detailed as to the basis and rationale for the professional opinions therein. *See* 20 C.F.R. § 404.1527(e)(1)(i), (2)(i)(State agency medical and psychological consultants "consider the evidence in [a claimant's] case and make findings of fact about medical issues . . . [including the claimant's] residual functional capacity," and they "are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."); s*ee, e.g., Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (where non-examining sources' opinions are reasonably consistent with the record as a whole, an ALJ may assign significant weight to them); *Johnson*, 434 F.3d at 656-57 (same); *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004) (same). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. Furthermore, even if the allegedly contradictory evidence Plaintiff highlights could support a different result, the court's role is not to second-guess the ALJ's findings. Rather, when "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the . . . ALJ[]." *Craig*, 76 F.3d at 590 (internal quotation omitted). Moreover, as discussed in the previous section and in footnote 6, the record discloses that Drs. Cleply, Ebert, and Richardson did not provide professional opinions on Plaintiff's ability to do work and, therefore, the applicable law regarding the weighing of expert "opinions" is not applicable to their reports and records. Nevertheless, it is clear that those reports and records were considered by the ALJ in connection with his review of the support for the expert opinions that were issued and weighed.

23

The undersigned finds that the ALJ adequately considered and evaluated all medical-opinion evidence as required and his conclusions are supported by substantial evidence. Because the ALJ appropriately considered, analyzed, and discussed his rationales for assigning the weights he did to the various medical opinions regarding Plaintiff's RFC and because his determinations are supported by substantial evidence in the record, his treatment of the opinion evidence of record does not present reversible error.

c.      Determination of Plaintiff's Credibility

In connection with his RFC determination, the ALJ assessed the credibility of Plaintiff's hearing testimony and statements to medical providers regarding the nature and extent of the functional limitations he experienced. Tr. 27-28. Focusing on the alleged limitations arising from Plaintiff's mental-illness impairments, citing to the report from Dr. Thompson, Tr. 427-31, the ALJ stated, "[r]egarding the claimant's alleged Anxiety and Depression, there is no longitudinal history of functioning except what the claimant reported during his June 2010 mental status evaluation." Tr. 27. The ALJ also noted that Plaintiff's "financial interest in the outcome and the evidentiary inconsistencies detract from reliance on the claimant's testimony as a primary basis for decision-making." Tr. 27. Plaintiff objects to the first quoted statement regarding the absence of records showing a longitudinal history of Plaintiff's functioning and argues that it requires this court to reverse the ALJ's decision, contending, first, that there is contradictory evidence in the record (from the background narrative portions of Dr. Thompson's and Dr. Cleply's reports) indicating that Plaintiff accessed mental-health treatment while he was prison at some undisclosed time and that he also was a mental-health patient for "3 sessions" in 2004. Tr. 428, 471. Second,

24

Plaintiff also objects to the ALJ's reliance on any absence of records showing such longitudinal history to discount Plaintiff's credibility because he contends that it wrongfully penalizes Plaintiff for his financial inability to pay for such treatment.

A claimant's symptoms caused by his or her impairments are considered to diminish the claimant's capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4). Under the applicable regulations, an ALJ evaluates a claimant's credibility using a two-step process. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, such as pain and mental distress. § 404.1529(a). The regulations indicate that a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7P, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b). After determining that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ then must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. § 404.1529(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence as is usually the case where

functional limitations arising from mental-illness are alleged, the ALJ must assess the credibility of any statements the claimant made to support the alleged disabling effects of such limitations. SSR 96–7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ considers "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1), (2), objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.*; and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. § 404.1529(c)(3); *see Craig v. Chater*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at **4-5. The ALJ may not reject a claimant's allegations of the intensity and persistence of symptoms solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. *See* SSR 96-7P, 1996 WL 374186, at *6. Social Security Ruling 96-7P provides further guidance on how to evaluate a claimant's credibility, indicating that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will

26

have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id*. at *6–7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations . . . for the purposes of judging the credibility of the individual's statements." *Id*. at * 7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id*. Although a lack of resources to follow the prescribed medical treatments may in some circumstances justify a claimant's failure to obtain treatment, a claimant must first demonstrate that he or she attempted to obtain treatment and was denied such treatment because of claimant's inability to pay or lack of insurance. *See Scarborough v. Astrue*, No. 1:12-cv-006, 2012 WL 6864775 (Dec. 26, 2012) (collecting cases with similar holdings), *report and recommendation adopted*, 2013 WL 170182 (W.D.N.C. Jan. 16, 2013); *see also Mitchell v. Astrue*, No. 2:11-cv-0056-MR, 2013 WL 678068, at *4 (W.D.N.C. Feb. 25, 2013). Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96–7P, 1996 WL 374186, at *4. When considering whether an ALJ's credibility determinations are supported by substantial evidence, a district court does not replace its own credibility assessments for those of the ALJ, but, rather, the court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine

27

the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984).

Having thoroughly reviewed the record, the undersigned finds that Plaintiff's objections do not present reversible error because the record as a whole shows that the ALJ performed the required analysis and considered the appropriate criteria in making his credibility determination. The record fully supports the ALJ's finding that there is a lack of records showing a longitudinal history of the extent of functional limitations caused by mental illness described by Plaintiff and that Plaintiff's statements are inconsistent with other record evidence and that Plaintiff had a financial interest in the outcome of his claim. Although Plaintiff testified that he rarely or never leaves his house and does no housework or other activities because of his alleged symptoms from his physical and mental impairments, Tr. 56, 63-64, 75-75, his wife provided information to the Commissioner indicating that he does go to family gatherings and church, he does light housework and childcare, and he goes outside "everyday." Tr. 204-10. Also there is evidence from Dr. Ebert's medical records showing that Plaintiff told him that his symptoms showed improvement with counselling sessions and medication. Furthermore, the medical report from Dr. Cleply notes Plaintiff's concern over finances. Tr. 473. Furthermore, comparison of the ALJ's statement about the lack of a longitudinal history with the contents of Dr. Thompson's June 14, 2010 report to which the ALJ references shows that the statement is reasonably supported by the contents of that report, as well as by the content of Dr. Cleply's report. While Dr. Thompson's report contains a detailed summary of Plaintiff's self-reported history of mental-health-related problems going back to a period of incarceration some undisclosed time before 2006 and an allegedly

28

panic-attack-related car accident in 2007, it does not indicate that Plaintiff ever sought out medical

care for the alleged problems other than a statement that "[h]e has gone for counseling and . . . saw

a psychiatrist or counselor while in prison." Tr. 428. Also, even though Dr. Cleply notes that

Plaintiff's period of prison incarceration was between 1995-98 and that his "[p]sychiatric history

includes [3 sessions] of treatment in December 2004 for depression with psychotic features and

possible PTSD," Tr. 471, Plaintiff did not submit medical records from any of the alleged

mental-health care prior to 2006. Furthermore, despite Plaintiff's assertions otherwise, the ALJ did

note that Plaintiff had been participating in mental-health treatment between 2010 and time of the

hearing as indicated by his statement that "the claimant's records show he improved when

receiving counseling and medications." Tr. 28 (citing to Dr. Ebert's October 4, 2011 and January

17, 2012 treatment notes found at Tr. 543-46).

   Plaintiff also challenges the ALJ's reliance on the lack of documentation of a longitudinal

history of impaired functioning and his related finding that Plaintiff has "not generally received the

type of medical treatment one would expect for these alleged severe symptoms until late 2010,

after a[n October 2010] psychiatric hospitalization," Tr. 27, by asserting that he "had not been

employed for several years, had no health insurance, and no income to pay for medical care." Pl's

Brief at 20, ECF No. 15. However, Plaintiff did not testify at the ALJ hearing that he did not pursue

mental-health treatment consistently before 2010 because of finances or that he was unable to

obtain such treatment at reduced or low cost through charitable or publicly supported providers.

Moreover, there is no evidence in the record to support Plaintiff's assertions in his brief that the

lack of documentation of a history of consistent mental-health treatment was because the Laurens

MHC, where he is seen by Dr. Ebert, "can only see patients on a somewhat infrequent basis due to a lack of resources." Pl's Br. 20, ECF No. 15. In absence of any record support for Plaintiff's post-hearing statements regarding his financial ability and the limited amount of treatment from Dr. Ebert that he can access, such a challenge to the ALJ's credibility findings fails. *Scarborough; see also Buchholtz v. Barnhart*, 98 F. App'x 540, 545-56 (7th Cir. 2004) (finding that ALJ had a right to assume that if there was evidence of a claimant's inability to afford treatment, it would have been produced). As previously noted, Plaintiff bore the burdens of production and persuasion at all steps other than Step Five, *Pass*, 65 F.3d at 1203; *Seacrist*, 538 F.2d at 1057, and his failure to produce evidence to explain the lack of a longitudinal history that would support his testimony about the extent of his functional limits prevents him from challenging the ALJ's partial reliance on missing supporting document of consistent treatment to support his credibility determination.

The undersigned finds that the ALJ conducted the proper analysis and his finding that the credibility of Plaintiff's statements about the extent of functional limitations caused by his mental illness was diminished, in part, by the lack of records showing a longitudinal history of such limitations, "evidentiary inconsistencies," and Plaintiff's financial interest in the outcome is rational and supported by substantial evidence. As result, the ALJ's credibility determination does not present reversible evidence.

d.    Interpretation of Content of Medical Reports

The ALJ specifically found that Dr. Thompson's opinion that that Plaintiff "could not work around people or in a typical work environment without an expectation that his psychological symptoms would intensify and his job would be interrupted," Tr. 429, should be accorded "only

moderate weight" in connection with the RFC determination. Tr. 28. The ALJ stated that one reason for his decision to limit the weight given to Dr. Thompson's opinion was that the doctor recommended that Plaintiff's condition be revisited in six months to a year, indicating that "the opined limits are not restrictive." Tr. 28. Another reason provided was the ALJ's finding that Dr. Thompson's "conclusion is not fully supported by the record as a whole." Tr. 28. Plaintiff contends that the ALJ's decision should be reversed because the ALJ misinterpreted Dr. Thompson's statement about "revisitation" of Plaintiff's mental condition; however, the undersigned finds that the interpretation of that language was a rational one in light of the record as whole and it should not be disturbed by the court. *See Vitek*, 438 F.2d at 1157-58 (ALJ's findings entitled to deference where they are rational in light of record evidence as a whole).

Nevertheless, even if the ALJ did improperly interpret the "revisitation" statement as providing support for his finding that Plaintiff's mental impairments could improve with consistent and appropriate treatment, he also indicated that his decision to limit the weight given to Dr. Thompson's opinion was that it is not fully supported by the record as a whole. Specifically, the ALJ noted that Plaintiff's medical records show sporadic and conservative mental-health treatment and that his condition tended to improve with treatment contradicted Dr. Thompson' opinion. That finding is an important one to the RFC determination because the Fourth Circuit has stated that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (emphasis added; citations omitted). The undersigned concludes that the ALJ's statement that Dr. Thompson's opinion is contradicted by the record as a whole is fully supported by substantial evidence in the form of the

reports of the state-agency consultants Drs. Kesser and Durham and the reports of Plaintiff's most recent and consistent mental-health provider, Dr. Ebert. Accordingly, the undersigned finds that the ALJ's interpretation of Dr. Thompson's "revisitation" statement does not present reversible error.

Finally, Plaintiff also challenges the ALJ's related statement that "the medical records reveal that the medications and counseling have been relatively effective in controlling the claimant's symptoms." Tr. 27. Plaintiff contends that there is contradictory evidence in the records of Dr. Ebert that shows lack of improvement. Pl. Br. 20, ECF No. 15. Review of the record as whole discloses that the ALJ's finding in this regard is both rational and supported by substantial evidence. For example, Dr. Ebert's treatment notes from March 2011, July 2011, October 2011, all contain notations indicating that Plaintiff told the doctor that certain medications and counseling sessions helped him. Tr.532, 536, 543. Moreover, Plaintiff's suggestion that "the records from his hospitalization at Self Memorial Health Care," contradict the ALJ's findings regarding the sporadic and conservative nature of Plaintiff's mental-health care prior to his filing his DIB claim does not present reversible error. While those records do show an October 2010 hospitalization for mental-health reasons, they actually support the ALJ's findings that Plaintiff received little or no mental-health treatment for years. Notably, in the Self Medical Center records, Dr. Cleply stated in his report that post-hospitalization "follow-up with a psychiatrist to treat auditory and visual hallucinations as well as depression via psychotropic medication will be an important first step" (Tr. 473 (emphasis added)), indicating that Plaintiff was not participating in such treatment leading up to his hospitalization.

32

The undersigned finds that the ALJ performed a thorough analysis of the evidence and carefully weighed Plaintiff's statements against the objective medical findings, medical-source opinions, Plaintiff's activities of daily living, and other evidence in the record. He fully explained his reasons for discounting Plaintiff's statements about the allegedly disabling effects of his impairments, pointing to specific pieces of evidence that he believed diminished Plaintiff's credibility and the lack of longitudinal history of impaired functioning was not the only basis on which Plaintiff's credibility was discounted and rationally interpreted medical records that indicated that Plaintiff's symptoms were treatable and not necessarily permanent in nature. The ALJ applied the correct law, made reasonable findings, and his conclusions are supported by substantial evidence in the record as whole. Accordingly, no reversible error is shown by the credibility determination made in this case.

e.     The Physical RFC Determination

In addition to the various contentions against the RFC determination in this case insofar as it concerns Plaintiff's mental-illness impairments discussed previously, Plaintiff also contends that the ALJ overstated his ability to perform work requiring him to use his hands and fingers. ECF No. 15 at 25-26; ECF No. 20 at 3-4. He contends that, as a result, the VE's opinion that he could perform the bench hand or table worker jobs does not constitute substantial evidence to support the ALJ's ultimate finding of no disability. In support of this argument, Plaintiff points, primarily, to the records from Dr. Brown, the surgeon who performed Plaintiff's shoulder surgery in October 2008, Tr. 333-76, and the findings contained in Dr. Richardson's report. Tr. 432-37. The ALJ included a lengthy summary of Dr. Brown's records and expressly noted his final opinion in the

33

summary of medical evidence in the record. Tr. 23-24. As previously stated, the ALJ also noted and summarized the records from Dr. Richardson and expressly stated that he considered her test results in arriving at the RFC determination. Tr. 25-26. Also, the ALJ expressly indicated reliance on the opinions from state-agency consultants who opined that the medical records they reviewed, including those of Dr. Brown and Dr. Toussaint regarding their evaluation and treatment of Plaintiff for his continued complaints of right-side pain and restriction after his surgery and from Plaintiff's post-surgical physical therapy provider, showed that Plaintiff could perform posturally and environmentally limited work ranging in exertion levels from medium (Dr. Hopkins) to light (Dr. Vogelsang). Tr. 29-30. The ALJ also discredited, to some degree, Plaintiff's statements regarding the extent of his physical limitations based on the contents of available medical reports showing that Plaintiff had not sought extensive medical care for the alleged physical symptoms, did not attend all scheduled physical therapy appointments, and did not make good effort at completing some of the post-surgical testing. Tr. 26-27.

Having reviewed the record as a whole, the undersigned finds that the RFC determination in this case relative to Plaintiff's physical impairments is supported by substantial evidence, and that Plaintiff's contentions do not require reversal. While it is true that Dr. Brown's records and Dr. Richardson's report support the ALJ's finding that Plaintiff has a severe impairment from his shoulder injury and the results of the surgery undertaken to correct it, they do not support the extent of physical limitation from that impairment that Plaintiff claims, nor do they show that the limitations he does have preclude all work. The records cover a period of attempted conservative treatment of Plaintiff's work-related shoulder injury between May through September 2008,

leading up to the surgery that was performed on October 8, 2008, and contain Dr. Brown's final opinion for a workers' compensation claim on May 7, 2009. Tr. 375. That opinion was rendered after Plaintiff was discharged from pre-surgical industrial rehabilitation therapy during which it was noted that Plaintiff missed several appointments, Tr. 285, 299, 307, 309, and after a period of post-surgical physical therapy during which it was noted that he did not exert maximum effort. Tr. 363. Dr. Brown opined that Plaintiff had reached maximum medical recovery from the surgery despite continuing complaints of pain and restricted movement, and that he sustained a 14% permanent impairment of his upper right extremity and an 8% permanent impairment of his whole person as a result of his labral tear and the repair surgery. The only work-related limitation noted by Dr. Brown was that Plaintiff be restricted to no overhead use on his right side. Tr. 375. Dr. Brown did not say that Plaintiff was limited in picking up items or reaching for or handling items at shoulder level or below with either hand, nor did he recommend additional treatment. As previously noted, Dr. Richardson did not provide any professional opinion about Plaintiff's ability to perform work, but the ALJ specifically stated that he did consider her test results in making his RFC determination. Tr. 29. Also, Dr. Touissant's minimal, handwritten records of his approximately one-month treatment period (between September and October 2009) do not contain any professional opinion as to Plaintiff's ability to work, show only conservative treatment of Plaintiff's complaints of pain with common prescription medications (Ultram, Soma, and Motrin),[8] and a "discharge" with the patient "in good condition." Tr. 422-26. Plaintiff also points

---

[8] Ultram "is [a narcotic analgesic] used to help relieve moderate to moderately severe pain." http://www.webmd.com/drugs/2/drug-11276/ultram-oral/details (last consulted March 3,

to evidence of his consistent complaints of pain and reduced movement in his right arm, neck, and back that he made to other doctors during the post-surgical period.

On the other hand, as previously discussed, the work-related medical opinions rendered by the state-agency consultants who reviewed the same medical reports which Plaintiff contends support his contentions clearly support the RFC determination regarding Plaintiff's documented and credible physical functional limitations. Dr. Vogelsang provided a detailed summary of the records she reviewed in arriving at her conclusion that Plaintiff was not precluded from performing light work with the postural and environmental limitations that the ALJ included in his RFC determination. Also, Dr. Hopkins reviewed the same records and determined that Plaintiff could even perform medium intensity work with similar limitations. Those two opinions were the most recent ones addressing Plaintiff's physical impairments that were before the ALJ and were based on the expert's review of all the medical evidence available at that time. They provide the required substantial evidence to support the physical RFC determination. Furthermore, the ALJ's credibility determination regarding Plaintiff's statements was fully explained and is adequately supported by the record as whole showing poor effort on testing, irregular attendance and effort at physical therapy, and minimal use of post-surgical medical care for the alleged pain and restriction on Plaintiff's right side. Nevertheless, the record discloses that the ALJ did not completely

---

2015). "Soma" "is [a muscle relaxer] used short-term to treat muscle pain and discomfort." http://www.webmd.com/drugs/2/drug-12153/soma-oral/details (last consulted March 3, 2015). Motrin is a "nonsteroidal anti-inflammatory drug" that "is used to relieve pain from various conditions such as . . . muscle aches and arthritis." http://www.webmd.com/drugs/2/drug-4387-9368/motrin-oral/ibuprofen-oral/details (last consulted March 3, 2015).

discredit Plaintiff's statements related to the extent of his physical functional limitations as evidenced by his use of the lesser intensity "sedentary work" as the basis for his RFC determination.

The ALJ adequately explained his rationale for determining Plaintiff's physical RFC and the record evidence provides substantial support for that determination. *See* 20 C.F.R. § 404.1529 (setting out requirements for an ALJ's credibility determination); SSR 96-7P, 1996 WL 374186 (providing guidance on credibility determinations); *see also Williams v. Astrue*, No. 4:10-cv-2966-TER, 2012 WL 694038, at *9 (D.S.C. Mar. 5, 2012) (finding ALJ's opinion sufficiently explained how he determined Plaintiff's RFC). The ALJ was in the best position to determine Plaintiff's credibility, *see Shively v. Heckler*, 739 F.2d at 989, and it is not this court's function to re-weigh the evidence that the ALJ considered and that supports his RFC determination. *See Johnson v. Barnhart*, 434 F.3d at 653; *Mastro v. Apfel*, 270 F.3d at 176; *Spicer v. Colvin*, No. 3:12-460-TLW, 2013 WL 3929824 (D.S.C. July 29, 2013). Because sedentary work with postural and environmental limitations including the ability to alternate sitting and standing and restriction from overhead work and only occasional reaching or handling with the right hand, and the ALJ's finding that Plaintiff was less than credible in his statements about his functional limitations are both fully supported by the relevant medical opinions and other available evidence in the record, the undersigned finds that the physical RFC determination in this case does not present reversible error.

2.     Appeals Council's Treatment of Additional Evidence

As a part of its Order denying review of the ALJ's decision, the Appeals Council stated,

> We considered the medical record from The Beckman Center for Mental Health
> Services, dated June 7, 2012 (6 pages). We considered whether the Administrative
> Law Judge's action, findings, or conclusion is contrary to the weight of the
> evidence of record.
>
> We found that this information does not provide a basis for changing the
> Administrative Law Judge's decision.
>
> We also looked at the medical record from Lakelands Family Practice, dated
> October 17, 2012 (2 pages). The Administrative Law Judge decided your case
> through May 25, 2012. This new information is about a later time. Therefore, it
> does not affect the decision about whether you were disabled beginning on or
> before May 25, 2012.

Tr. 2. Plaintiff argues that this case should be reversed because the Appeals Council did not

conduct a detailed analysis of the additional evidence, which he contends contradicts the ALJ's

finding that Plaintiff's statements about the nature and extent of his mental illnesses were less than

credible because the available records did not show a longitudinal history of his participation in

mental-health treatment. Pl. Br. at 19, ECF No. 15; Pl. Resp. Br. at 7, ECF No. 20. He argues that

the additional evidence could have changed the ALJ's credibility determination and, as a result, it

"warranted further review by the agency." ECF No. 20 at 7. The Commissioner answers that the

Appeals Council was not required to provide any analysis of the additional evidence because it

denied review of the ALJ's decision.

   Applicable law indicates that when a claimant requests review of an ALJ decision, the

Appeals Council "may deny or dismiss the request for review, or it may grant the request and

either issue a decision or remand the case to [the ALJ]." 20 C.F.R. § 404.967. The regulations

permit claimants to submit additional evidence that was not before the ALJ when requesting

Appeals Council review. 20 C.F.R. §§ 404.968, 404.970(b). In such cases, the regulations require

38

that the Appeals Council first determine if the submission constitutes "new and material" evidence that "relates to the period on or before the date of the [ALJ's] hearing decision." § 404.970(b). The Appeals Council must consider evidence submitted with a request for review if the evidence is new, material, *and* relates to the period on or before the date of the ALJ's decision. *See Wilkins v. Sec'y, Dep't of HHS*, 953 F.2d 93, 96 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative. *Williams v. Sullivan,* 905 F.2d 214, 216 (8th Cir. 1990). Evidence is material if there is a reasonable possibility that the evidence would have changed the outcome. *See Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985). When such new and material evidence is submitted, the Appeals Council then "evaluate[s] the entire record including the new and material evidence." *Id*.; *see also Felts v. Astrue*, No. 1:11CV00054, 2012 WL 1836280, at *1 (W.D. Va. May 19, 2012) (quoting *Wiltons v. Sec'y, Dep't of HHS*, 953 F.2d 93, 96 (4th Cir. 1991)). After this evaluation, if the Appeals Council finds that the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record," *id*., it will grant the request for review and either issue its own decision on the merits or remand the case to the ALJ. §§ 404.967, 404.977(a), 404.979. But, if, upon consideration of all the evidence (including any new and material evidence), the Appeals Council finds that the ALJ's action, findings, or conclusions are not contrary to the weight of the evidence, it can simply deny the request for review. *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). Nothing in the SSA or the regulations requires the Appeals Council to explain its rationale for denying review. *Id.* Where, as here, the Appeals Council considers additional evidence before denying the claimant's request for review of the ALJ's decision, "the court must 'review the record as a whole, including the [additional] evidence, in order to determine whether

substantial evidence supports the Secretary's findings.' In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, provides 'an adequate explanation of [the Commissioner's] decision." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

In this case, because the Appeals Council denied review of the ALJ's decision, it was not required to provide any findings or explain its rationale in any way. *Meyer*, 662 F.3d at 705. For this reason alone, Plaintiff's arguments relating to the Appeals Council's review do not present reversible error. However, the undersigned's review of the additional records that were submitted in conjunction with the record as a whole discloses that the Appeals Council's decision not to consider the Lakeland Family Practice records because they covered a period of treatment after the time covered by the ALJ's decision was correct. The Appeals Council's determination that the additional evidence from the Beckham Center that it made part of the record did "not provide a basis for changing the Administrative Law Judge's decision," Tr. 2, was also correct. The contents of the additional records from Lakeland Family Practice show that they were generated following an appointment on October 17, 2012, which was approximately five months after the May 25, 2012 cutoff date for the ALJ's consideration of Plaintiff's DIB claim. As the Appeals Council noted, Plaintiff would be required to file a new claim to have his condition and treatment after May 25, 2012 considered, thus the Appeals Council correctly refused to make the Lakelands Family Practice records part of the record because they were both irrelevant and immaterial to its consideration of the ALJ's decision. Furthermore, the additional records from Dr. Ebert regarding Plaintiff's evaluation at the Beckman Center on June 7, 2012 (less than a month after the cut-off

40

date of the ALJ's decision), Tr. 549-51, do not differ significantly from his January 17, 2012 treatment note, Tr. 545-46, which the ALJ did consider. Dr. Ebert assigned the same GAF score at both appointments, Tr. 546, 551, and noted that Plaintiff was cooperative and displayed intact attention, concentration and memory, as well as good insight and judgment, with euthymic mood, appropriate affect, and no hallucinations or delusions. Tr. 545, 549. Dr. Ebert's June 7, 2012 finding that Plaintiff's symptoms were unstable, indicated by a checkmark on a form, and was not explained, Tr. 551, and, in any event, the same "finding" is contained in the notes from the November 9, 2010, Tr. 539, March 1, 2011, Tr.536, July 5, 2011, Tr. 532, and October 4, 2011, Tr. 544, treatment notes that the ALJ did consider. In sum, the additional records submitted to the ALJ were either irrelevant in time or essentially cumulative of other records from the same provider that were before the ALJ at the time of his decision. While they do show that Plaintiff was continuing his recommended mental-health treatment regime he had begun during the period leading up to the ALJ's decision, they do not contradict the ALJ's finding relative to his credibility determination that Plaintiff did not show a longitudinal history of mental-health treatment before he filed his DIB claim. Furthermore, in light of their cumulative nature vis-a-vis other records that were considered by the ALJ, the additional Beckman Center records do not negate the substantial evidence that supports the ALJ's decision in this case. Accordingly, the undersigned finds that the Appeals Council's treatment of the additional evidence that Plaintiff submitted does not present reversible error.

III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig*, 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, it is hereby ORDERED that the Commissioner's decision be affirmed.

IT IS SO ORDERED.

March 5, 2015                                                   Kaymani D. West
Florence, South Carolina                              United States Magistrate Judge